The next case is Stapleton v. Barrett Crane, Design and Engineering. Good morning. May it please the Court, I'm Charles Kelly. I'm here on behalf of the liquidating trustee of the Keywell Estate, Kelly Bodan Stapleton, and I would like to address two issues. One is were there facts that were presented below that would allow for the trial court to have found the functional equivalent of privity on the trustee's tort claim? The same question is at issue here with respect to the functional equivalent of privity on the contract claim. And if I do have a couple minutes at the end, I'd also like to try to clarify some of the confusion that comes over whether or not the trustee raised a new claim with respect to the issue of third-party beneficiary. So first, with respect to the issue of are there facts in this record that would allow for the establishment of the functional equivalent of privity on a tort claim, the answer is yes. I think the parties and the trial court below all picked... Excuse me, this is Judge Winter. Is it undisputed that neither Barrett Crane nor, I guess his name is Usman, knew of the contract between the junkyard and the general contractor? Your Honor, it is undisputed that there's no evidence that the pavilion contract was handed to the engineers, Mr. Usman or Mr. Barrett, but we think that misses the issue. The issue here is... Is it also undisputed that the structure, as finally constructed, did not conform to the drawings? Your Honor, that's true, it did not, but the central issue there is, is that a material deviation? That, in turn, goes to the issue of proximate care. That issue was not raised before the trial court below, and there are factual disputes about whether that's a material deviation. The first and most important is... The end walls weren't there that were in the drawings, right? That's correct. That certainly sounds like a material deviation. Well, Your Honor, I would first bring your attention to the record, and Mr. Usman himself, who was the engineer of record in this case, by New York law, those were his drawings. He testified that in his analysis for this structure, he considered this to be closed. The issue of whether or not it was open or partially enclosed was irrelevant to his analysis. Second, on the issue of proximate cause, we have in the record, and we brought to the court's attention, that both of the experts in this case, the expert hired by the appellant, and the expert hired by the defendants, say that the material defect in this case related to the fact that there was bracing in this structure that did not comply with New York State law. There was a failure to have adequate bracing that led to the buckling in the structure, and both defendants say the same thing. What's material here is that a structural engineer, I think as this court knows, is the starting point for any structure. That structural engineer performing calculations that involve calculus and sophisticated physics issues, doesn't let that out the door unless he or she is satisfied that the drawings are done properly. That's the engine. That's the starting point, and these calculations- With the company? With Keywell?  In terms, Your Honor, did they sit down and discuss their engineering with, or did they mail drawings to Keywell? That's correct. There was no- Was there any contact? Yes. I think the most dramatic contact of all is that these drawings, which were done in the first instance by Mr. Barrett, and then thereafter signed by the engineer of record, Mr. Usman, were the underlying drawings that gave rise to the creation of the structure. The contact is the drawings that they reviewed for the general contractor. Yes. That's a direct contact. Is there any other contact? Any communication? Let's do it this way. Any communication? I guess you would argue that that was a communication as well. I think that there's nothing, if you're a structural engineer, that's more direct than that. The mischief that's occurring here, and that makes this a very significant case, is that the only other three cases that have been cited by the parties here where there were structural engineers involved, and that's Rotterdam, and that's ATCAS, and that is- Rotterdam, ATCAS. It'll come to me, I'm sorry, but there's a third case. In each one of those, the court said- I'm sorry, it's the Ossining case. It's in the tort analysis. In each one of those cases, the courts made findings that the direct contact was the drawings, that the aim and the purpose of the drawings was to induce action by another party, either to proceed with a structure to build it or to fix it. There is nothing- In none of those cases was that the only contact. Am I right about that? That's true. In each of the other cases. But here, I think, is the social policy, and here's the mischief. So if this court rules that that's not enough, then structural engineers say, hey, look, don't enter into an oral contract. My God, that's a disaster. There's another layer of protection that the Second Circuit has just put into place. Don't ever get on a conference call with a beneficiary because, my God, you could have liability. The Second Circuit has just ruled that as long as all you do is your drawings, you're off the hook. That is a stunning precedent to set. That is horrible social policy. And the reason why all these other courts in New York- It's actually cited in each of these cases as if a truism, that it's inconceivable, inconceivable, the Logan-Baldwin case says, that an engineer would not know that he or she is acting for the direct benefit of the owner of a property. As a result, and here, that's the case. The real issue is, did these engineers know that they were acting for the direct benefit of Keywell? The recorders replete with answers that say, yes, they knew that this building was for Keywell, and they knew without them stamping these drawings that there would be no structure. There's nothing more direct- Back to Barrett. It seems as if we're informal. Would you take a look at these drawings for me? That's what it sounds like anyway. Yes, Your Honor. That's been the defense. What are the realities and what's in this record? This record reflects that Mr. Barrett was working on his own drawings. The underlying drawing for the structure was first created by him, too. He's reviewing an engineer who was working by himself for the first time on a set of drawings. He's hired, as Mr. Barrett himself testified, in order to make sure these drawings were done properly. I would bring the Court's attention to the Brownwell case, which I think states this very beautifully. At that moment, Mr. Barrett is as if standing in the shoes of Pavilion. He's as direct with Keywell at that point as Pavilion was when they sat there and said, we're going to find not just ourselves for what we can do, but subcontractors who are qualified to provide you with what you need. Mr. Barrett then, and this will be part of the trial if, pray God, we get there, Mr. Barrett, the record shows, also saw the same exact structural problem that led to the buckling. He pointed out, and there's testimony, and I bring the Court's attention to pages A2519 through A2520 of this record, the buckling issue that's at stake here, he identified as an engineer. He said that slenderness ratios were missed, that the member ratios were missed, and he still allowed it to go on. What he's saying, actually, is I was incredibly negligent. If an engineer, again, the social policy here is stunning. If the Second Circuit says, look, if what you say in the end is, I was here just to actually check a typo or two, even though I was an engineer, I was here actually to make sure the coloring on the drawings is right, even though I was an engineer, allows for the kind of mischief that's actually at work in this case. They're admitting that. Do you mind addressing, you said you hoped to get to it, the third-party beneficiary argument. Your adversary says this wasn't raised until the motion for summary judgment had been filed, and it was just too late. Yes. Thank you, Your Honor. I'm happy to address that. I want to say two things. One is, I think that there's confusion afoot on whether or not you need to plead specifically a claim and a complaint and style it as if a third-party beneficiary claim, or whether it's satisfactory to bring a claim which is for breach of contract, which is established through the establishment of rights as an intended third-party beneficiary. The Rotterdam case that I've just brought to your attention, the Logan Baldwin case I brought to your attention, ATKIS, which both parties have sided with approval, Brownwell, what happened there were contract cases that were at the heart. There was no third-party beneficiary claim. The right analysis here is, and as those cases point out, do you establish that there are facts that reflect that you as the owner were the intended beneficiary of the work of the engineers? Incredibly here, and importantly for us in urging you to reverse, the trial court said there is evidence that we are a third-party beneficiary. Did you, in fact, plead such a claim below? Yes. I would bring your attention, Your Honor, to all the following paragraphs in a minimum. Paragraph 38 is the paragraph where we first say, and the RLI case cited with approval by Judge Scretany below, says that the subcontractors are party to this contract. Paragraphs 47 through 55 all say that Usman and Barrett were working for the benefit of and on behalf of Keywell, and that in the context of what they were doing, they were failing to meet their duties because of multiple failures, of wind load, of stresses on the fabric. I would also bring your attention to paragraphs 84 and 85 as it relates to Mr. Usman. There we say that Mr. Usman was working for the direct benefit of Keywell and had a duty. If you look in the contract cases we cited for you and the tort cases, they all say that if you reference benefit and duty, you've satisfied your pleading obligation. Again, with Barrett, we reached that because we used the express term for Keywell's benefit and duty in paragraphs 95 and 96 of the amended complaint. So yes, Your Honor, or Honors, there were no fewer than 10 to 12 paragraphs. And the last point on that that's really significant, I think, is that hopefully you'll reverse and send this back so we can have a trial on this buckling of the structure. But in the normal course, and as the judge below found, we have facts in the record. There was discovery on the issue of third-party beneficiary, what the underlying contracts, to the extent they existed, were, and what duties and for whom those duties were undertaken. That's in the record, and the trial court said it appears that we can establish a third-party beneficiary claim. At worst, we should be allowed, pursuant to Rule 15 at this point, to amend if what we have to do is actually state a claim that says that the top third-party beneficiary and do that. But I would urge you, I don't think we need to do that under New York law, especially in a lot of the other cases where no one else has had to do it. Thank you very much. If it pleases the Court, I'm Brian Souter. I represent Mr. Barrett and his company. Right up until today, the claim has been made that Mr. Barrett prepared these drawings. There's no proof in the record for that whatsoever. Mr. Barrett is a former employee of Pavilion, who was not the engineer of record in this case, and was not the responsible member for Pavilion at the time of this project. The record is uncontradicted that he had an oral contract with Pavilion to provide some edits to the drawings, and he gave examples of that. The clips don't look right. You've got the same detail twice. You don't need it. That kind of thing. It's uncontradicted that he never agreed to review the design, review the calculations, was never provided the calculations. Paid how much? $500, Your Honor. Canadian. I don't know how that works out back then, but that's what it was. This would be an incredible extension of the functional equivalent of privity to consider Mr. Barrett and Keywell to have the functional equivalent of privity. He never heard of Keywell until some point, some undetermined point, when he originally got the drawings, they said Frewsburg, which is a little town near Jamestown, New York, not even the company, a location. He never contacted Keywell. They never contacted him. Simply put. He knew this was being done for some client. Of course. That's it. That's it. There is not that linkage, that closeness between Keywell and Mr. Barrett to allow for the functional equivalent of privity. Absent that, these claims must fail. There is no direct contract. There was no breach of any direct contract by Mr. Barrett. He didn't have a contract with Pavilion. To somehow say that because the contract implied that subcontractors were somehow tied into it would be unfair to hold Mr. Barrett to that standard because he never saw it. He never knew what the terms were, and he never agreed to be bound by those terms and conditions. The lower court got it exactly right. If for some reason you want to look further, his oral contract describes a very circumscribed duty. He didn't breach it. He did what he was asked to do, and there's no proof of proximate cause. In any event, all we ask is that you affirm the lower court's decision. Thank you very much. May it please the court. My name is Peter Lorisella. I am here on behalf of Zane Usman. Your honors, the lower court's decision granting summary judgment to Mr. Usman should be affirmed. It should be affirmed for several basic reasons. On the breach of contract claim, number one, there was no contract whatsoever between Mr. Usman and Keywell. Number two, there was no functional equivalent of privity between Mr. Usman and Keywell. He was the engineer of record? He stamped the drawings, yes. Should that stand for something? I mean, he stamped drawings, putting his name on it, knowing that it was going to the client. Certainly. He did know that it was going to a client. Like Mr. Barrett, Mr. Usman only knew, was hired by Pavilion, had a standing oral agreement with Pavilion, had done about ten of these projects before, very similar with Pavilion, was provided the drawings from Pavilion and reviewed those drawings to see if they conformed with engineering standards in Frewsburg, New York, and in New York in general, and approved those drawings by putting his engineering stamp on that. He did recognize that it was going to a company called Keywell. That's all he knew. Had never had any direct contact with Keywell. Keywell's own representatives that testified said that they didn't even know who Mr. Usman was. Never had any communications with him. There's, and certainly he was not. How do you respond to the argument that the drawings are a key contact or communication? There is no case support that I'm aware of that simply drawings that are communicated between the general contractor, the engineer to the general contractor, and then the general contractor to the owner, constitutes a communication and enough evidence of contact to equate to functional equivalent of privity. I have seen no case laws with that. In respect to Ossining, I think Mr. Kelly cited that case. I think Your Honor noted that it involved other communications. It was not just the school district, the engineer sending engineering plans to the school district who was the owner. It was the school district had recommended that engineer to be hired by the general contractor. The school district and the engineer had communicated directly numerous times with each other, and the engineer was sending his bills directly to the school district. So there was vast amounts more of direct contact in the Ossining case, and I believe in the other two cases that he cited as well. There's a lot of discussion about the RLI case in the appellant's brief. That case is distinguishable. There was an acknowledgement in the subcontract that the subcontractors were going to agree to the master agreement. It was based upon the Brownell decision which said that. And in addition in the RLI case, there was a direct relationship between the owner and the subcontractor because there was direct payments between those parties. So there was a functional equivalency of parity in that case. With respect to the professional negligence claim, that was also properly dismissed for many of the same reasons we just discussed. There's only a limited exception to the economic loss doctrine. We discuss it at length in our brief. And it's only when there's linking conduct between the subcontractor and the owner where there would be, or the engineer here and the owner, where there would be, again, a close relationship that would lead to privity, which would lead to a claim for professional negligence. That certainly wasn't here. Linking conduct is the same as the functional equivalent of privity? Yes, I believe it is. And I think the cases all do support that. The same sets of facts are usually found in most of those cases, and we believe that it is the same. And with respect to the third-party beneficiary claim, there was no, it was not pled. The only allegations in the complaint concern the master agreement between Pavilion and Keywell. The only claim of breach is that Usman and Barrett breached the master agreement. The court was well within its discretion to find that that was not pled. That was not, nor could it be proved in any event. And finally, with respect to, well, I'll just say that there was a material deviation. We don't think we need to get into that because that was not really addressed. But Mr. Usman's plans were not, was what was implemented by Keywell. Keywell, on its own, changed the plans that Mr. Usman had stamped and had approved by the removal of end walls. So even if we got to that issue, that would be another claim, another reason to uphold the district court's decision. And for those reasons, I respectfully request that you do. Thank you. Thank you. Thank you both. Do not reserve any rebuttal time, or thank you all. Well argued. That is the last case on the calendar to be argued this morning, so I will ask the clerk to adjourn.